UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SEBASTIAN M. et al.,                          *
                                              *
                 Plaintiffs,                  *
                                              *
        v.                                    *        Civil Action No. 09-10565-JLT
                                              *
KING PHILIP REGIONAL SCHOOL DISTRICT          *
and MASSACHUSETTS DEPARTMENT OF               *
ELEMENTARY AND SECONDARY                      *
EDUCATION,                                    *
                                              *
                 Defendants.                  *


MEMORANDUM

March 31, 2011

TAURO, J.

I.      Introduction

        Plaintiffs Sebastian[1] M. and his parents, Lisa M. and Michael M., bring suit against

Defendants King Philip Regional School District ("King Philip") and the Massachusetts

Department of Elementary and Secondary Education ("DESE") for failing to provide Sebastian

with a free appropriate public education ("FAPE").  Presently at issue are Plaintiffs' Motion for

Summary Judgment [#24] and Defendant King Philip's Cross Motion for Summary Judgment

[#35].  For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED and

Defendant's Cross Motion for Summary Judgment is ALLOWED.

---

[1] "Sebastian" is a pseudonym used for the purposes of confidentiality.  Administrative R.,
Vol. I, 231 n.1 [#22] [hereinafter AR].

II.     Background[2]

Plaintiff Sebastian M. is a twenty-three-year-old man who was found eligible to receive special education services at the age of three because of developmental delays, moderate mental retardation, delays in fine and gross motor control, and express, receptive, and social language and visual perceptive deficits.[3]  Sebastian was involved in an early intervention program and received both speech and language therapy and occupational therapy ("OT") before entering public school.[4]

During the 1998–99 school year, Sebastian was in the sixth grade.[5]  Pursuant to an Individualized Education Program ("IEP"),[6] Sebastian's placement changed from an in-district placement to a placement at the Work Lab I program of the Bi-County Educational Collaborative ("BICO").[7]  Sebastian remained at BICO until the end of the summer of 2001.[8]

---

[2] Determining the adequacy of an Individualized Education Program ("IEP") for a disabled student "is a fact-intensive exercise," Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993), so this court presents the facts of this case in some detail.

[3] AR, Vol. I, 233 [#22].

[4] AR Vol. II, 284 [#22]; Administrative R. Tr., Vol. I, 60 [#22].

[5] AR, Vol. I, 233 [#22].

[6] An IEP is "a written document detailing [a] student's current educational level, the short-term and long-term goals of the educational plan, the specific services to be offered (including transition services), and a set of objective criteria for subsequent evaluation." Lenn v. Portland Sch. Comm., 998 F.2d at 1086 (citing 20 U.S.C. § 1401(20); 34 C.F.R. § 300.346).

[7] AR, Vol. I, 233 [#22]; AR, Vol. IV, 1567 [#22].  BICO is an educational collaborative established by an agreement among various school committees pursuant to Massachusetts General Laws chapter 40, section 4E.  Def. King Philip Regional School District's Proposed Findings Fact ¶ 3 [#45].

[8] AR, Vol. I, 233, 235 [#22].

In the fall of 2001, Sebastian's placement changed from the Work Lab I program to the

Work Lab II program at the North Attleboro High School, still under the auspices of BICO.[9]

During this time and until approximately the end of the 2004–05 school year,

> Seb was in the exploratory phase of [the] program[,] working at jobs on campus such as the BICO office and the BICO cafeteria. He also participated in business tours at a nursery, a few animal facilities, and a supermarket. In addition[,] people from the community came in to speak to Seb and his class about the different jobs that were available. Seb also went out into the community to the library, post office, local restaurants and businesses, attended career fairs in 2002 and 2004 and participated in job shadows, business tours and internships before participating in paid work. The purpose of the exploratory phase of the program was for BICO staff is [sic] to get an idea of what each student's stamina was and what their interests were.[10]

In May and June of 2002, King Philip conducted a three-year evaluation of Sebastian.[11]

The occupational therapist noted that Sebastian's range of motion and strength had improved

from a diminished state to within functional limits since the last evaluation, in November 1998.[12]

The 2002 OT evaluation also showed that Sebastian continued to have visual motor and visual

spatial deficits.[13] Sebastian also displayed some deficits in language skills and pragmatic/social

conversation skills.[14] Academically, "[e]ducational testing showed that [Sebastian] continued to

---

[9] AR, Vol. I, 235 [#22]. Because Sebastian was fifteen years old at that time, the special education team thought that Sebastian would be more appropriately placed in a high school vocational program. AR, Vol. I, 235 [#22].

[10] AR, Vol. I, 235 [#22].

[11] AR, Vol. I, 235 [#22].

[12] AR, Vol. I, 235–36 [#22].

[13] AR, Vol. I, 236 [#22]. He scored between a four-year, eleven-month level and a six-year, two-month level in these areas. AR, Vol. I, 236 [#22].

[14] AR, Vol. I, 236 [#22] ("Seb's receptive language skills at that time were approximately at a six to seven year level if presented with simple material; however[,] when presented with complex or lengthy material such as understanding time, money and sequencing or longer

exhibit delays in all areas.'"[15]

In June 2002, the team responsible for creating Sebastian's IEPs ("the team")[16] met to review the evaluation and propose a new IEP for Sebastian.[17]  The proposed IEP, which was accepted by Sebastian's parents, called for a substantially separate special education program that included speech/language therapy, OT, vocational services, and social/emotional support.[18]

Progress reports from 2002 through 2005 showed that Sebastian was making steady progress.[19]  But Sebastian's mother, Lisa M., did not believe these progress reports, because Sebastian "was not doing many skills independently at home."[20]  Lisa did not, however, tell the team that she disagreed with the IEPs and indeed accepted the IEPs for the 2002–03, 2003–04, and 2004–05 school years.[21]

---

paragraph comprehension, Seb scored at a two year, eight month old level.  Seb['s] . . . conversation [was] at times . . . off topic or display[ed] inappropriate laughter with difficulty maintaining eye contact.  However, when compared with the MR population, Seb displayed average to above average skills in community independence." (citations omitted)).

[15] AR, Vol. I, 236 [#22] (explaining that Sebastian "scor[ed] in the mid first to mid second grade level in language arts and the low 3rd grade level in math skills").

[16] The Individuals with Disabilities Education Act ("IDEA") "specifically confers upon parents a right to be part of the 'IEP team,' that is, the group of individuals charged with formulating a particular child's IEP and which comprises educational professionals who either possess specialized knowledge about or will be involved in the child's education."  Lessard v. Wilton-Lyndeborough Coop. Sch. Dist. (Lessard I), 518 F.3d 18, 23 (1st Cir. 2008) (citing 20 U.S.C. § 1414(d)(1)(B)).

[17] AR, Vol. I, 236 [#22].

[18] See AR, Vol. I, 236 [#22].

[19] AR, Vol. I, 236 [#22].

[20] AR, Vol. I, 236 [#22].

[21] AR, Vol. I, 236 [#22].  One of the IEPs that Lisa accepted was the IEP that covered March 2004 through March 2005, which eliminated Sebastian's "half hour a week of vision

4

During Sebastian's time at BICO, he participated in a variety of transitional and vocational programs.[22]  During the 2003–04 school year, Sebastian moved from the exploratory phase of BICO to the community-based phase.[23]

In May 2005, Sebastian received a three-year adaptive physical education reevaluation.[24]  During the evaluation, Sebastian "had a difficult time with both body and spatial awareness and had very poor visual tracking."[25]  At that time, Sebastian also received his educational three-year reevaluation, his speech and language evaluation, and his OT evaluation.[26]  His teachers and therapists indicated that

> Seb was using transportation to his work sites independently and scored in the 4th grade level in word recognition and computational skills. . . .  Seb could identify 39 out of 40 safety signs and although he could not give an exact definition of all the sign[s ,] he knew what to do. . . .  Seb appear to have improved his ability to focus his attention and process more efficiently since the last three year reevaluation and had made slight gains in receptive language and had increased processing speed since the last reevaluation. . . .  Seb demonstrated slight growth in expressive language skills and . . . he had made a two-year jump in pragmatic skills. . . .  Seb had made [occupational] progress over the years, [but] . . . standardized testing of Seb's visual perceptual and motor testing were similar to results from three years ago.[27]

---

services to consultation four times per year."  AR, Vol. I, 236 [#22].

[22] AR, Vol. I, 237–38 [#22].  Sebastian was able to access all of these programs and community experiences safely and without incident, with a single exception: on or about September 24, 2004, Sebastian failed to pay a fare to a transportation service.  AR, Vol. I, 238–39 [#22].  But on or about October 1, 2004, Sebastian sent a letter of apology and the overdue fare and was able to resume use of the transportation service.  AR, Vol. I, 239 [#22].

[23] AR, Vol. I, 238, 240 [#22].

[24] AR, Vol. I, 241 [#22].

[25] AR, Vol. I, 241 [#22].

[26] AR, Vol. I, 241 [#22].

[27] AR, Vol. I, 241 [#22] (citations omitted).

On June 20, 2005, the team met to review Sebastian's evaluation results and to develop an IEP for the 2005–06 school year.[28] The proposed IEP

> maintained the quarterly vision consultation and the hour-a-week of OT and added a session of [adaptive physical education] each week, increased vocational services from 12 to 16 hours per week, increased social skills training from 45 minutes to an hour per week and greatly increased the time allocated for social communication.[29]

On July 26, 2005, Sebastian rejected this IEP in full.[30] Lisa also rejected the IEP, and King Philip received the rejected IEP on August 2, 2005.[31] Sebastian remained in the BICO program at the North Attleboro High School.[32]

On August 10 and August 24, 2005, the team reconvened to discuss the rejected IEP.[33] No resolution was reached, so Lisa retained an Advocate and the team met again on September 21, 2005.[34]

The team met again on October 12, 2005 to review the IEP.[35] The team told Lisa that Sebastian was doing well in school.[36] Lisa told the team that she had concerns because Sebastian

---

[28] AR, Vol. I, 242 [#22].

[29] AR, Vol. I, 242 [#22].

[30] AR, Vol. I, 232 [#22].

[31] AR, Vol. I, 232 [#22].

[32] AR, Vol. I, 242 [#22].

[33] AR, Vol. I, 243 [#22].

[34] AR, Vol. I, 243 [#22]. At Lisa's request, the team decided to move Sebastian to a different classroom. Lisa was not happy with this decision but consented because she felt she had no other choice. AR, Vol. I, 243 [#22].

[35] AR, Vol. I, 244 [#22].

[36] AR, Vol. I, 244 [#22]. Progress reports showed that Sebastian had increased his pragmatic language skills, was using the credit union with infrequent

had "meltdowns when he was at home during unstructured time or when there were changes to his schedule," but Lisa did not tell the team "any specifics regarding what was happening at home."[37]  Lisa also said that she and Sebastian's father, Michael, had concerns about Sebastian's independent living skills such as shoe tying, toileting, showering, shaving, and "money management issues, functional academics, safety issues and direct safety training."[38]  The new proposed IEP "expanded the accommodations sections, added goals in vocational and independent living skills (including shoe tying) and goals in safety and social judgment, made each goal and objective more detailed and added five hours a week in independent living skills."[39]  The team also agreed to meet with Lisa "for scheduled monthly progress meetings and to reconvene in the fall of 2005 to discuss recommendations regarding Seb's visual needs."[40]  King Philip did not agree, however, to explore residential programs, as Lisa and Michael had requested.[41]

On October 19, 2005, King Philip sent Sebastian's parents the resulting IEP.[42]  On November 29, 2005, Lisa rejected the IEP in full.[43]

---

verbal and visual cues and only occasional reminders to withdraw money needed for the bus, . . . and was participating effectively in both his weekly social skills group and in town meetings, but that he still needed to work on being less silly or rude in less structured settings.
AR, Vol. I, 244 [#22].

[37] AR, Vol. I, 244 [#22].

[38] AR, Vol. I, 244 [#22].

[39] AR, Vol. I, 244 [#22].

[40] AR, Vol. I, 244 [#22].

[41] See AR, Vol. I, 244 [#22].

[42] AR, Vol. I, 244 [#22].

[43] AR, Vol. I, 244 [#22].

The team met again on December 14, 2005; January 12, 2006; and January 20, 2006 to refine Sebastian's IEP and discuss transitional planning.[44] Both Lisa and her Advocate had

> considerable input regarding the wording of each goal[] and objective and approved the language to each goal. Before moving onto each goal[, the chair of the team] asked if everyone was in agreement and if there was anything that anyone would like to add. Neither [Lisa] nor her Advocate voiced any objection or offered additions before the [team] moved on to another goal.[45]

On January 25, 2006, a new IEP was proposed.[46] On March 17, 2006, with the advice of her Advocate, Lisa "rejected the IEP in full."[47]

At this time, Lisa and Michael were upset that BICO was not "following through" on the promises it made at the team meetings.[48] But BICO could not implement many of the programs that Sebastian's parents desired because they had rejected the IEPs in full.[49] For that reason, Sebastian's progress reports from 2006 were based on old goals and indicated that Sebastian "had

---

[44] AR, Vol. I, 244 [#22].

[45] AR, Vol. I, 244–45 [#22] (citations omitted).

[46] AR, Vol. I, 245 [#22]. The new IEP
increased added accommodations such as a computer typing program, and added 1.2 hours per week in independent living skills and in functional academics and offered a vocational assessment to be done in March 2006, exploration of an afterschool . . . program, an OT consult with [Sebastian's parents] regarding personal care issues, collaborative clinical consultation services, implementation of [a program] for transitional planning, exploration of the MBTA Ride for transportation, job shadowing three to four times a year and exploration of [a safety] program. [The chair of the team] also offered to meet with [Lisa] weekly either in person or by phone or written correspondence.
AR, Vol. I, 245 [#22] (citations omitted).

[47] AR, Vol. I, 245 [#22]. Additionally, Lisa did not accept the team leader's "offer for weekly meetings or to participate in the parent support group that BICO offered." Id.

[48] AR, Vol. I, 245 [#22].

[49] AR, Vol. I, 245 [#22].

achieved most of these goals and that Seb required new goals."[50]

On June 21, 2006, King Philip received an evaluation of Sebastian conducted by Thomas Lehane of Horace Mann Educational Associates ("HMEA").[51] This evaluation focused on making recommendations for transitional planning for Sebastian.[52] Lehane concluded that Sebastian did have some independent skills.[53] In the community domain, "Seb did demonstrate some basic, unsophisticated skills," and he showed "strengths in his ability to communicate with others," although he was "relatively passive in initiating social interaction."[54] In work situations, Lehane concluded that Sebastian "had made progress"[55] and that Sebastian "would be best suited to an environment in which some kind of mechanical or assembly task is involved."[56] Finally,

---

[50] AR, Vol. I, 245 [#22].

[51] See AR, Vol. I, 247 [#22]. HMEA promotes the potential of people with developmental disabilities through education, support, and life experiences. HMEA: Missions, Vision, & Values, http://www.hmea.org/mission.html (last visited March 29, 2011).

[52] AR, Vol. I, 247 [#22]. The evaluation was based upon an observation of Sebastian at BICO, his work sites, a work site chosen by Lehane as a test, interviews with parents and teachers at BICO, and a survey completed by Sebastian. AR, Vol. I, 247 [#22].

[53] AR, Vol. I, 247 [#22] ("[Lisa] reported that Seb was able to get up on his own, get dressed, make his own breakfast including operating the toaster, get his school bag and walk to the school bus stop from home and complete night time routines but needed verbal prompts to get his wallet and other items and brush his teeth thoroughly. However, Seb did require help at work and at home during long periods of unstructured time such as extended school vacations and weekends and has verbal outbursts of anger when he is bored." (citations omitted)).

[54] AR, Vol. I, 247 [#22].

[55] AR, Vol. I, 247 [#22] ("[H]e was interacting with people whom he knew, was doing repetitive familiar tasks and did less well with more flexible new situations or when there was a break in the routine . . . .").

[56] AR, Vol. I, 248 [#22]. Moreover, Lehane recommended that such work begin on a part-time basis and be systematically increased and goals for the work experience be outlined to Sebastian prior to beginning at a new work site. AR, Vol. I, 248 [#22].

Lehane recommended that Sebastian be assisted in "locating and participating in regular recreational activities in the community[,] with a particular emphasis on peer-group affiliations."[57]

On October 10, 2006, King Philip received "a written report from an independent evaluation from Ann Marie Lasoski, Psy.D." that was done at the request of Sebastian's parents.[58] Dr. Lasoski reviewed Sebastian's record, conducted some testing, and observed Sebastian at BICO on May 23, 2006.[59] Dr. Lasoski concluded that Sebastian's program "was not coordinated" and "recommended that Seb receive an individualized life skills program in a full year setting that emphasized activities of daily living, independent living skills, recreational skills, social skills and vocational skills taught in a repetitive, concrete, systematic, multidisciplinary manner."[60] Overall, Dr. Lasoski concluded that although Sebastian had previously been classified as moderately mental retarded, Sebastian was in fact mildly mentally retarded.[61]

On November 1, 2006, the team met to review Sebastian's "vocational and neuropsychological evaluations, discuss transition planning and review Seb's progress."[62] Dr. Barbara Sherman, Ph.D., reviewed Dr. Lasoski's report and agreed with Dr. Lasoski "that the current program was not a coordinated program."[63] But Dr. Sherman disagreed with most of Dr.

---

[57] AR, Vol. I, 248 [#22].

[58] AR, Vol. I, 248 [#22].

[59] AR, Vol. I, 248–49 [#22].  Dr. Lasoski did not speak with Sebastian's teachers or see his work.  AR, Vol. I, 249 [#22].

[60] AR, Vol. I, 249 [#22].

[61] AR, Vol. I, 248 [#22].

[62] AR, Vol. I, 250 [#22].

[63] AR, Vol. I, 250 [#22].

Lasoski's findings. Specifically, Dr. Sherman concluded that Sebastian was moderately (not mildly) mentally retarded and that BICO remained an appropriate placement for Sebastian.[64]

On November 17, 2006, King Philip sent Lisa and Michael a proposed IEP.[65]

On December 19, 2006, King Philip received a letter from Lisa and Michael's attorney stating that Lisa and Michael "intended to enroll Seb as a residential student at public expense . . . because of previously-expressed concerns that the program offered by [King Philip] was not appropriate to meet Seb's needs."[66] On December 21, 2006, Lisa and Sebastian rejected the proposed IEP in full.[67] Sebastian began attending Cardinal Cushing School ("Cardinal Cushing") on January 2, 2007.[68]

Cardinal Cushing did not develop an IEP for Sebastian.[69] At Cardinal Cushing, Sebastian worked on many of the same vocational and community skills that he had worked on at BICO.[70] But unlike BICO, where Sebastian had jobs off-campus and independently rode specialized transportation to his work sites, all of Sebastian's jobs at Cardinal Cushing were on-campus workshops.[71]

---

[64] AR, Vol. I, 250 [#22].

[65] AR, Vol. I, 251 [#22].

[66] AR, Vol. I, 252 [#22].

[67] AR, Vol. I, 252 [#22].

[68] AR, Vol. I, 252 [#22].

[69] AR, Vol. I, 252 [#22].

[70] AR, Vol. I, 252–54 [#22].

[71] AR, Vol. I, 252 [#22].

On November 29, 2007, a representative of King Philip observed Sebastian at Cardinal Cushing.[72] On December 4, 2007, the team met for Sebastian's annual review.[73] The team members based at King Philip believed that many of the skills that Sebastian was working on at Cardinal Cushing "were ones that BICO had not only worked on but ones that they thought that Seb had already obtained."[74] The team developed another IEP that "contained goals and objectives in independent living skills . . . , vocational skills, social pragmatic skills, functional reading, fine motor skills and transition planning."[75]

On or about January 4, 2008, King Philip sent the proposed IEP to Lisa.[76] On January 30, 2008, Lisa and Sebastian rejected the IEP because Lisa "did not feel that the BICO program was appropriate since it contained goals and objectives that Seb was not capable of doing" and because the IEP "did not offer a continuation of the Cardinal Cushing residential program."[77]

In February and March of 2008, King Philip completed a three-year reevaluation of Sebastian,[78] and on April 15, 2008, the team reconvened to create a new IEP.[79]

---

[72] AR, Vol. I, 254 [#22].

[73] AR, Vol. I, 255 [#22].

[74] AR, Vol. I, 255 [#22].

[75] AR, Vol. I, 255 [#22]. There was no discussion at this meeting of assessments that Cardinal Cushing had conducted in 2007, because no one at King Philip or BICO was told about these assessments. AR, Vol. I, 255–56 [#22].

[76] AR, Vol. I, 256 [#22].

[77] AR, Vol. I, 256 [#22].

[78] AR, Vol. I, 256 [#22].

[79] See AR, Vol. I, 257 [#22].

On April 25, 2008, Sebastian's parents filed a request for a hearing with the Bureau of Special Education Appeals ("BSEA").[80] Sebastian's parents sought retroactive reimbursement for the expenses related to Sebastian's placement at Cardinal Cushing; continued placement of Sebastian at Cardinal Cushing until he turned twenty-two; compensatory services past age twenty-two; and damages for substantive and procedural violations.[81]

On May 9, 2008, Lisa rejected the proposed IEP.[82]

On May 15, 2008, King Philip filed a response that alleged

that its program was both substantively and procedurally appropriate and, in the alternative, that claims should be reduced or denied because neither the notice for unilateral placement nor the hearing request was timely filed; [Sebastian's p]arents had not allowed the School District to complete evaluations before placement, and compensatory claims used for the purpose of obtaining tuition reimbursement was [sic] not appropriate or legally permissible in the 1st Circuit.[83]

On June 18, 2008, the team met for the final time, but the matter was not resolved.[84]

Also on June 18, 2008, an administrative hearing on this matter began.[85] The hearing consisted of five and one-half days of oral testimony.[86] In her decision, the Hearing Officer identified the following issues in the case:

---

[80] See AR, Vol. I, 259 [#22]. BSEA is a division of DESE. See Compl., 1, 3 [#1].

[81] AR, Vol. I, 259 [#22].

[82] AR, Vol. I, 259 [#22].

[83] AR, Vol. I, 256–60 [#22].

[84] AR, Vol. I, 260 [#22].

[85] AR, Vol. I, 260 [#22]. See generally AR, Vol. I, 231–74 [#22] (reproducing the Hearing Officer's Decision).

[86] AR, Vol. I, 232 [#22]. Sebastian's parents submitted fifty-one exhibits and King Philip submitted one hundred fifty-eight exhibits. AR, Vol. I, 232 [#22].

I.      Did [King Philip's] IEPs designating a program for a vocational and educational program at BICO for the 2006–2007 and 2007–2008 school years provide Seb with a . . . FAPE[] in the least restrictive environment . . . [?]

II.     If not, is Seb entitled to compensatory services?

III.    Did [King Philip] commit procedural violations that denied Seb a FAPE?

IV.     If so, is Seb entitled to compensatory services?

V.      If so, should any compensatory award be reduced or denied because [Sebastian's p]arents' hearing request was not timely and/or because [Sebastian's p]arents did not give [King Philip] ten days notice of their unilateral placement at Cardinal Cushing . . . ?

VI.     May compensatory services be in the form of tuition reimbursement and prospective services at Cardinal Cushing . . . ?

VII.    If so, was and is Seb's program at Cardinal Cushing appropriately responsive to his special needs so that he can benefit educationally, thus entitling him to tuition reimbursement?[87]

Ultimately, the Hearing Officer held that the IEPs that King Philip proposed from 2006 to 2008 provided Sebastian with a FAPE in the least restrictive environment.[88]  As the Hearing Officer explained,

> [King Philip's] testimony is credible that if BICO had been able to implement the IEPs, Seb would have been able to make meaningful progress at home. . . .  [Sebastian's parents], although they had the opportunity to do so, did not inform [King Philip] of the specific problems they were having with Seb, and the [team], based on the information that it did have, offered a number of goals and objectives . . . and services that would have helped with behaviors at home . . . .  However, these services could not be implemented because the IEPs were rejected in full. . . .  Since the IEPs were offered and reasonably calculated to enable Seb to make progress . . . , this Hearing Officer cannot hold [King Philip] accountable for any lack of progress because they were not implemented.[89]

For these reasons, the Hearing Officer held that Defendants were not required to reimburse Lisa and Michael for the cost of Cardinal Cushing.[90]

---

[87] AR, Vol. I, 232–33 [#22].

[88] AR, Vol. I, 271 [#22].

[89] AR, Vol. I, 267 [#22].

[90] AR, Vol. I, 269 [#22].

In addition, the Hearing Officer ordered King Philip to provide Sebastian's parents with compensatory services in the form of several updated evaluations for Sebastian because of "incidents of noncompliance with Seb's IEP in the form of updated evaluations."[91] Specifically, the Hearing Officer explained that King Philip "did not consistently implement the IEP."[92]

## III.  Discussion

### A.  The Statutory Scheme

The Individuals with Disabilities Education Act ("IDEA") provides that, "as a condition for receiving federal funds, states must provide" every disabled child with a FAPE.[93] The primary method of delivering a FAPE to a disabled child is through an IEP.[94] The IEP "must include, at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered."[95]

An IEP must be "custom-tailored" to fit the disabled child.[96] An IEP must also "be something different than the normal school curriculum and something more than a generic, one-size-fits-all program for children with special needs."[97] The "critical inquiry" is "'whether a

---

[91] AR, Vol. I, 271 [#22].  In contrast, the Hearing Officer explicitly decided that "tuition reimbursement at Cardinal Cushing is not an appropriate remedy."  AR, Vol. I, 269 [#22].

[92] AR, Vol. I, 268 [#22].

[93] Lessard I, 518 F.3d at 23.

[94] Id.

[95] Id. (citing 20 U.S.C. § 1414(d)(1)(A); Lenn, 998 F.2d at 1086).

[96] Id.

[97] Id.

proposed IEP is adequate and appropriate for a particular child at a given point in time.'"[98] But it

is important to note that

> [t]he IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.[99]

Services delineated in an IEP must be delivered to a student in the student's "least

restrictive environment," which requires both that "[t]o the maximum extent appropriate, children

with disabilities . . . are educated with children who are nondisabled"[100] and that developers of

IEPs should prefer mainstream schooling.[101] This "preference for mainstreaming" means that a

student is not entitled to placement in a residential educational program if that student "'would

make educational progress in a day program.'"[102]

A parent may challenge the adequacy of an IEP by filing a complaint with the state

educational agency.[103] For example, in Massachusetts, the BSEA conducts administrative due

---

[98] Lenn, 998 F.2d at 1086 (citing Burlington v. Dep't of Educ., 736 F.2d 773, 788 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985)).

[99] Id. (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 198 (1982); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990)).

[100] 34 C.F.R. § 300.114(a)(2)(i).

[101] See id. § 300.114(a)(2)(ii).

[102] Lenn, 998 F.2d at 1086 (quoting Abrahamson v. Hershman, 701 F.2d 223, 227 (1st Cir. 1983)). This preference for mainstreaming exists even if a residential placement "'would more nearly enable the child to reach his or her full potential.'" Id.

[103] Lessard I, 518 F.3d at 24; see Lenn, 998 F.2d at 1086 ("A parent may challenge an IEP's adequacy by demanding a due process hearing before the state educational agency.").

process hearings on disputed special education decisions.[104]  The state educational agency "must convene a hearing to pass upon the adequacy of a proposed IEP."[105]

If a parent demonstrates that the programs and services offered by a school district are inappropriate and instead that the programs and services that the parent has obtained privately are appropriate, the parent may be reimbursed for the cost of private special education and related services.[106]

B.     The Standard of Review

The IDEA provides that, if parties in a civil action challenge the decision of a state administrative officer,[107] a federal district court "shall receive the records of the administrative proceedings; . . . shall hear additional evidence at the request of a party; and . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."[108]  In considering the findings of an educational agency under the IDEA, a district court must apply "an intermediate standard of review . . . —a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete

---

[104] Compl. ¶ 6 [#1].

[105] Lessard I, 518 F.3d at 24 (citing 20 U.S.C. § 1415(f)).

[106] Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ., 471 U.S. 359, 369–70 (1985).  To receive reimbursement, a parent must give adequate notice to the school district that the parent has privately obtained an educational program.  See 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).

[107] If a parent or guardian challenges an IEP in a hearing before a state educational agency and the agency nonetheless approves the IEP, "the parent or guardian may seek further review in either state or federal court."  Lenn, 998 F.2d at 1086 (citing 20 U.S.C. § 1415(e)(2)).

[108] 20 U.S.C. § 1415(i)(2)(C).

<u>de novo</u> review."[109]

In the course of this independent review, the court must accord the administrative

proceedings "'due weight.'"[110]  In other words,

> [a]lthough the exact quantum of weight is subject to the district judge's exercise of
> informed discretion, the judge is not at liberty either to turn a blind eye to administrative
> findings or to discard them without sound reason.  In the end, the judicial function at the
> trial-court level is 'one of involved oversight.'[111]

To prevail on a motion for summary judgment, the moving party must show "that there is

no genuine dispute as to any material fact" and that the moving party "is entitled to judgment as a

matter of law."[112]  In deciding a motion for summary judgment, "a court is not authorized to make

findings of fact."[113]

A motion for summary judgment is more complicated in a context in which a state

administrative officer has made factual findings.  Indeed, the it "is not crystal clear . . . how a

district court is to incorporate into the summary-judgment context the district court's duty to give

'due deference' to findings of fact and evaluative determinations of the state administrative

---

[109] <u>Lenn</u>, 998 F.2d at 1086 (citing <u>Roland M.</u>, 910 F.2d at 989; <u>Colin K. v. Schmidt</u>, 715 F.2d 1, 5 (1st Cir. 1983)).

[110] <u>Id.</u> at 1087 (quoting <u>Rowley</u>, 458 U.S. at 206); <u>see</u> <u>Ross v. Framingham Sch. Comm.</u>, 44 F. Supp. 2d 104, 112 (D. Mass. 1999) ("With respect to a hearing officer's findings of fact, a reviewing district court is directed to give due deference to them.").

[111] <u>Lenn</u>, 998 F.2d at 1087 (citations omitted); <u>see</u> <u>Lessard I</u>, 518 F.3d at 24 ("Judges are not trained pedagogues, and they must accord deference to the state agency's application of its specialized knowledge.").

[112] Fed. R. Civ. P. 56(a); <u>see</u> <u>Baltodano v. Merck, Sharp & Dohme (I.A.) Corp.</u>, No. 09-2027, 2011 U.S. App. LEXIS 4011 (1st Cir. Mar. 3, 2011) (citing <u>Collazo v. Nicholson</u>, 535 F.3d 41, 44 (1st Cir. 2008)).

[113] <u>Ross</u>, 44 F. Supp. 2d at 113.

officer."[114]  In the context of the IDEA, "a court is authorized to decide [a] case 'as a matter of law' on [a] motion for summary judgment if enough of the administrative findings and evaluative determinations are so well-founded that any other finding of fact that might be questioned is no longer material to the outcome."[115]

    C.    <u>Analysis</u>

Here, the BSEA Hearing Officer was correct in finding that the IEPs proposed between 2006 and 2008 were reasonably calculated to provide Sebastian with a FAPE in the least restrictive environment.  As an initial matter, the administrative record was comprehensive[116] and provided a more-than-sufficient basis for the Hearing Officer's findings.

Plaintiffs argue that because the proposed IEPs did not contain a transition plan for Sebastian, the IEPs were not reasonably calculated to provide a FAPE.[117]  But the administrative record makes clear that transition planning was discussed at all of Sebastian's team meetings. And although an IEP must contain statements of transition services,[118] "the IDEA does not require a stand-alone transition plan as part of an IEP."[119]  Because transition services were

---

[114] <u>Id.</u> (citing <u>Capistrano Unified Sch. Dist. v. Wartenberg</u>, 59 F.3d 884, 892 (9th Cir. 1995)).

[115] <u>Id.</u>

[116] <u>See</u> <u>supra</u> note 86 and accompanying text.

[117] <u>See</u> Pls.' Mem. Supp. Mot. Summ. J., 5–6 [#26].

[118] 20 U.S.C. § 1414(d)(1)(A)(vii); <u>see</u> <u>Lessard I</u>, 518 F.3d at 25.

[119] <u>Lessard I</u>, 518 F.3d at 25.

mentioned in the IEPs and because transition services were actually provided to Sebastian,[120] there is no error here based on transition planning.

Plaintiffs also argue that the IEPs were not reasonably calculated to provide a FAPE because Sebastian did not make progress during the 2005–06 and 2006–07 school years.[121] But the First Circuit has explicitly said that a student's lack of progress does not "necessarily betoken[] an IEP's inadequacy."[122] Moreover, the hearing officer considered evidence of Sebastian's progress during his time at BICO, and the record indicates that Sebastian did, in fact, make some progress.[123]

Finally, Plaintiffs argue that the Hearing Officer did not properly weigh the testimony of their expert, Dr. Lasoski.[124] As an initial matter, this court must grant some deference to the Hearing Officer and her weighing of the relevant evidence.[125] Moreover, as the First Circuit has explained, "the underlying judgment of those framing the [IEP] is given considerable weight. The standard of review is thus deferential to the educational authorities, who have 'primary

---

[120] See id. ("To be sure, the statutory provisions [of 20 U.S.C. § 1414(d)(1)(A)(vii)] implicitly acknowledge that transition services must be provided to disabled children who need them, in accordance with the Rowley standard.").

[121] See Pls.' Mem. Supp. Mot. Summ. J., 6–8 [#26].

[122] Lessard I, 518 F.3d at 29 ("Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE. But to impose the inverse of this rule . . . would contradict the fundamental concept that '[a]n IEP is a snap-shot, not a retrospective.'" (alteration in original) (citations omitted)).

[123] See, e.g., AR, Vol. II, 462–65, 487–90 [#22] (attaching Sebastian's 2006 Progress Reports, which indicate that Sebastian made progress in 2006).

[124] See Mot. Hr'g Tr., 9 [#42].

[125] See supra notes 109-11 and accompanying text.

responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs.'"[126]  Additionally, Dr. Lasoski did not work with Sebastian on a regular basis.  The Hearing Officer's decision thus credited Dr. Lasoski no less than it was required to, and this court finds the Hearing Officer's relative weighing of expert testimony appropriate.

Further, this court agrees with the Hearing Officer that King Philip cannot be held responsible for the fact that Plaintiffs rejected the IEPs in full and thus the IEPs could not be implemented.[127]  As the First Circuit has explained, "it cannot be that a school system transgresses the IDEA whenever a parent—for whatever reason—refuses to sign a completed IEP before the school year commences."[128]

Sebastian's parents had the burden of proof to demonstrate that BICO was an inappropriate placement for Sebastian.[129]  Because they have not done so, this court agrees with the Hearing Officer that a residential special education school is not the least restrictive

---

[126] Lessard v. Wilton-Lyndeborough Coop. Sch. Dist. (Lessard II), 592 F.3d 267, 270 (1st Cir. 2010) (citations omitted).  Similarly, "the IDEA confers primary responsibility upon state and local agencies to choose among competing pedagogical methodologies and to select the method most suitable to a particular child's needs."  Lessard I, 518 F.3d at 28 (citing Rowley, 458 U.S. at 207).

[127] AR, Vol. I, 267 [#22].

[128] Lessard I, 518 F.3d at 26 ("[A] parent's obstruction of the IEP process . . . can relieve a school system from its obligation to have an assented-to IEP in place at the start of the school year.").

[129] See Schaffer v. Weast, 546 U.S. 49 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.").

environment for Sebastian.[130]  After all, Sebastian made some progress at BICO,[131] and he might

have made further progress had the team been able to implement new IEPs for him.  Further,

Plaintiffs' own expert identified Sebastian as <u>less</u> severely disabled than during his previous years

at BICO, a time when Sebastian's parents accepted King Philip's IEPs.[132]  Because the Hearing

Officer found in favor of King Philip, she did not reach the question of whether Sebastian's

parents were entitled to reimbursement for the cost of Cardinal Cushing.  Because Cardinal

Cushing was not Sebastian's least restrictive environment, Sebastian's parents are not entitled to

reimbursement.[133]

　　　　The Hearing Officer did hold that Plaintiffs were entitled to compensatory services in the

form of updated evaluations from King Philip,[134] and this court agrees that this equitable remedy is

appropriate.

IV.　　<u>Conclusion</u>

---

[130] <u>See</u> 34 C.F.R. § 300.114(a)(2).

[131] <u>See</u> <u>Lessard I</u>, 518 F.3d at 29 ("Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE.").

[132] <u>See</u> <u>supra</u> text accompanying note 64.

[133] <u>See</u> <u>Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ.</u>, 471 U.S. 359, 369–70 (1985).  This court thus need not reach the question of whether Sebastian's parents gave King Philip adequate notice of their decision to place Sebastian at Cardinal Cushing.  <u>See</u> 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).

[134] AR, Vol. I, 270 [#22] ("[King Philip] will also provide Seb an updated transition planning evaluation.  [King Philip] will also provide Seb with a current vision evaluation from an independent certified vision specialist, an updated OT and language evaluation and will develop an updated transition plan that will be coordinated with DMR if [Lisa] chooses to contact them regarding benefits for services that may be needed as a result of the evaluations.").  The Hearing Officer ordered these compensatory services because the evidence showed that King Philip "did not consistently implement the IEP."  AR, Vol. I, 268 [#22].

For the foregoing reasons, the Hearing Officer's decision is sustained in full. Plaintiff's

Motion for Summary Judgment [#24] is DENIED and Defendant's Cross Motion for Summary

Judgment [#35] is ALLOWED.

AN ORDER HAS ISSUED.

/s/ Joseph L. Tauro
United States District Judge